IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JAMES W. VANDIVNER, JR.,                 )
                                         )
                    Petitioner,          )        Civil Action No. 2:20-433
                                         )
        v.                               )
                                         )
JOHN E. WETZEL, *et al.*,                )
                                         )
                    Respondents.         )

## MEMORANDUM

Before the Court is the counseled Petition for a Writ of Habeas Corpus (Doc. 5) filed by state prisoner James W. VanDivner, Jr. ("Petitioner") under 28 U.S.C. § 2254. For the reasons set forth below, the Court will deny the Petition and deny a certificate of appealability as to each claim.

## I.    Relevant Background

On the evening of July 5, 2004, Petitioner shot his former girlfriend, Michelle Cable, and her son, Billy Cable, outside Michelle's home located in Fayette County, Pennsylvania. Billy survived his injuries but Michelle, whom Petitioner shot in the head, did not. The Commonwealth charged Petitioner with criminal homicide in the shooting death of Michelle; attempted criminal homicide in the shooting of Billy; and two counts of aggravated assault (one count for assaulting Billy and the other count for assaulting Larry Newman, who was at Michelle's home at the time of the shootings).

Petitioner was initially represented by privately retained counsel. The trial court appointed Assistant Public Defender Susan Harper and Attorney Dianne Zerega to be Petitioner's counsel

1

after the Commonwealth notified the defense that it would seek the death penalty if he was convicted of first-degree murder for killing Michelle. Attorneys Harper and Zerega are referred to collectively as "Trial Counsel."[1]

Petitioner filed a pre-trial motion in which he argued that he is intellectually disabled and therefore categorically ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002), which held the execution of the intellectually disabled[2] contravenes the Eighth Amendment's prohibition on cruel and unusual punishment. The trial court conducted a pre-trial hearing on this motion at which the defense presented testimony from psychologist Adam C. Sedlock and Lawson Bernstein, M.D. After this hearing the trial court denied Petitioner's *Atkins* motion.[3]

Petitioner's trial was held in the Court of Common Pleas of Fayette County in February 2007. The Commonwealth presented evidence to establish that around 8:30 p.m. on July 5, 2004, Petitioner arrived at Michelle's home armed with a loaded gun. He "entered the home through the back door and, while walking through the home, encountered a family friend, Larry Newman, in

---

[1] In general, Attorney Harper was responsible for handling the guilt phase of the trial and Attorney Zerega was responsible for the capital sentencing phase of the trial. They cooperated in discussing and investigating various aspects of Petitioner's case, however.

[2] More recent authorities use the phrase "intellectually disabled" instead of "mentally retarded." *See Hall v. Florida*, 572 U.S. 701, 704 (2014). Except for quotations, this Court will do the same.

[3] Under *Atkins*, intellectually disabled offenders convicted of capital crimes are categorically excluded from the death penalty under the Eighth Amendment's Cruel and Unusual Punishment Clause. Under Pennsylvania law, an offender is intellectually disabled for the purposes of an *Atkins* claim if he or she demonstrates: (1) limited intellectual functioning; (2) significant adaptive limitations; and (3) onset before age 18. *Commonwealth v. Miller*, 888 A.2d 624, 628-29 (Pa. 2005). In Petitioner's case, the trial court determined that he failed to demonstrate at the pre-trial hearing that his intellectual disabilities manifested before age 18. Because Petitioner did not satisfy *Miller's* third prong, the trial court did not decide at the time whether he satisfied the other two prongs.

the living room." *Commonwealth v. VanDivner*, 962 A.2d 1170, 1173 (Pa. 2009) ("*VanDivner I*"). Petitioner "asked Larry where Michelle was, and Larry pointed to the front door. [Petitioner] then opened the door and walked onto the sun porch." *Id.* Billy and Michelle Cable were on the sun porch and Billy told Petitioner to leave. Petitioner pointed his gun at Michelle and Billy "pounced on [him] in an attempt to wrestle the gun from his hand." *Id.* Petitioner managed to keep the gun. By this point, Larry and his cousin Kenny Newman had joined the fray and Petitioner pointed the gun at Larry's head. Kenny swatted the gun away. A bullet discharged from Petitioner's gun at that time but it hit no one. Petitioner then broke free and went outside after Michelle, who had run off the sun porch. Petitioner shot Michelle in the head, mortally wounding her. He then went around to the back of the home where Billy now was and shot Billy in the neck. *Id.* at 1173-74.

At Petitioner's trial, the Commonwealth introduced evidence to show that after Petitioner shot Michelle and Billy he fled the scene in his Chevy Blazer. The police located his vehicle the next day on the side of the road in an isolated, wooded area in Brownsville, Pennsylvania. (Trial Tr. at 143-45.) On July 7, 2004, the police found Petitioner on property in Scenery Hill, Pennsylvania and he was taken into custody. The police collected several items in a field near where they found Petitioner, including the Jennings Bryco J22 semi-automatic handgun that he used to shoot Michelle and Billy. (*Id.* at 151.)

Corporal Stephen Tomovich was the officer who first approached Petitioner in the field. He testified at the trial that Petitioner asked him how Michelle was doing and whether she was dead. (*Id.* at 169.) Corporal Tomovich testified that Petitioner said to him "something to the effect of I really fucked my life up this time." (*Id.* at 170, 176.) Petitioner also tried to justify his actions

to Corporal Tomovich by stating that "there were eight people coming at him" during the incident. (*Id.*)

Trooper James Monkelis was the chief investigator on the case. (*Id.* at 254.) He testified that at the police barracks Petitioner said to him: "[T]his is a death penalty case and I don't want the needle…. Tell the DA I will plead guilty to life. I would have killed myself if I knew Michelle was dead." (*Id.* at 255.)

Jessica Cable was 15 years old when Petitioner shot and killed her mother. She testified that she witnessed the shooting. She said that she was at a neighbor's house when she saw Petitioner's Chevy Blazer coming up the road. She ran home because she knew her mother did not want Petitioner at the house. According to Jessica, she saw Michelle try and run from Petitioner after his gun discharged during the fight on the sun porch. (*Id.* at 39-40.) She testified: "[Petitioner] grabbed [Michelle's] hair and put the gun right here (indicating) and shot her, and then she fell. And he looked at her and said there you[ ] bitch, I said I was going to kill you[.]" (*Id.* at 39.) Jessica ran toward her mother but realized that she was fatally injured because she was unresponsive and blood was spurting from her head. (*Id.* at 40.) Jessica then saw Billy come from around the house holding his neck, indicating that Petitioner shot him too. (*Id.*) Two neighbors, sisters Cheree and Jessica Parrill, assisted Jessica by giving her towels to put on her mother's head. (*Id.* at 41-42.)

Patrick Rimel, whose then-girlfriend lived near Michelle's house, testified that he also witnessed Petitioner shoot Michelle in the head. Rimel stated that around 8:47 p.m. on July 5, 2004, he was in the passenger's side of a car located about ten feet into the alley behind Michelle's house. Rimel heard noises that at first sounded like fireworks. He and his friend, who was driving the car, pulled out of the alley and drove by Michelle's house to see what was going

on there. Rimel testified that he saw Larry and Kenny Newman running. He testified that he saw Petitioner grab Michelle by her hair and shoot her in the head. (*Id.* at 115-30.)

Billy Cable testified that after the fight with Petitioner on the sun porch, he (Billy) ran back inside the house and then to the back yard to try and "find some way of defending [his] family." (*Id.* at 61, 72.) When Billy was in the backyard, he saw Petitioner come around the side of the house toward him with a gun. (*Id.* at 62.) Billy testified that he placed his hands in the air and asked Petitioner not to shoot him. Petitioner disregarded Billy's plea not to shoot, aimed his gun at Billy and shot him in the neck. (*Id.*; *id.* at 74.) Billy then ran to the front of the house and saw his mother on the ground, shot in the head. (*Id.*)

Larry Newman testified that he was sitting on the couch in Michelle's living room when Petitioner arrived at her house. (*Id.* at 79.) Petitioner entered the living room and asked Larry where Michelle was. Petitioner then went out to the sun porch. Larry went out there too when he heard Billy Cable and Petitioner fighting. During this incident, Larry testified, Petitioner placed his gun near Larry's forehead. The gun discharged when Larry's cousin, Kenny, pushed Petitioner's arm away. (*Id.* at 80-81.) Larry did not see when Petitioner shot Michelle and Billy. (*Id.* at 81-82, 93-94.) He also stated that he only drank a couple beers at Michelle's. (*Id.* at 85.)

Kenny Newman lived across the street from Michelle and her family. He testified that he could see Michelle's sun porch from his house and that he ran there to assist Larry when he saw Larry and Petitioner fighting on the sun porch. (*Id.* at 105.) Kenny acknowledged on cross-examination that both he and Larry drank alcohol the day of the shootings. (*Id.* at 106.)

Dr. Cyril Wecht conducted the autopsy on Michelle. He testified at the trial as an expert in forensic pathology. He explained that Michelle had a gunshot wound to the head behind her left

ear lobe and that he removed one bullet from her head during the autopsy. (*Id.* at 239-40.) Dr. Wecht stated that the surrounding edges of the wound on Michelle's head were slightly blackened, which he explained "is something that we see when a shot is fired from a close distance." (*Id.*) In Dr. Wecht's expert opinion, the gun used to kill Michelle was fired from within a foot and a half of her head. (*Id.* at 241.) He described the wound as "a near contact wound of the head[.]" (*Id.* at 245.)

Petitioner, who did not testify at his trial, presented a diminished capacity defense to the charge of first-degree murder for killing Michelle. Diminished capacity is an extremely limited defense under Pennsylvania law. *Saranchak v. Beard*, 616 F.3d 292, 308 (3d Cir. 2010); *Commonwealth v. Taylor*, 876 A.2d 916, 926 (Pa. 2005); *Commonwealth v. Legg*, 711 A.2d 430, 444 (Pa. 1998); *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 943 (Pa. 1982); *Commonwealth v. Weinstein*, 451 A.2d 1344, 1347 (Pa. 1982). A defendant invoking it concedes general criminal liability but contends that the prosecution cannot prove specific intent to kill, an essential element of first-degree murder.[4] *See, e.g.*, *Weinstein*, 451 A.2d at 1347. "A defendant who successfully defends on the basis of diminished capacity is still liable for homicide, generally third-degree murder (and/or other) crimes not involving premeditation and deliberation[.]" 14 West's Pa. Prac., Crim. Offenses & Defenses § 1:117 (6th ed.).

Under Pennsylvania law, a diminished capacity defense "requires a defendant to establish through 'extensive psychiatric testimony [that he] suffered from one or more mental disorders

---

[4]  The elements of first-degree murder under Pennsylvania law are: (1) a person was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. *Commonwealth v. Padilla*, 80 A.3d 1238, 1244 (Pa. 2013) (citing 18 Pa.C.S. § 2502(a)).

which prevented him from formulating the specific intent to kill.'" *Saranchak*, 616 F.3d at 308 (quoting *Commonwealth v. Cuevas*, 832 A.2d 388, 393 (Pa. 2003) (which cited *Zettlemoyer*, 454 A.2d at 943)) (altered text added by court of appeals). To support this defense, Petitioner introduced testimony from psychologist Adam C. Sedlock, who had also testified at the pre-trial *Atkins* hearing. Sedlock testified that he met with Petitioner several times before the trial and ran a battery of tests on him. He described Petitioner as being in the "mild range of mental retardation" and explained that he had "an IQ level of 66." (*Id.* at 283.) Sedlock said that Petitioner exhibited damages to that part of the brain that controls thinking before acting and that he had a history of head trauma.[5] (*Id.* at 283-91.)

Petitioner also presented a voluntary intoxication defense, which is another type of extremely limited diminished capacity defense to the charge of first-degree murder. Under Pennsylvania law "the mere fact of intoxication does not make out a diminished capacity defense. Rather, to warrant that a homicide does not rise to the level of first-degree murder, the evidence must demonstrate that the defendant was intoxicated to such an extent that the defendant was overwhelmed to the point of losing his sensibilities." *Commonwealth v. Spotz*, 896 A.2d 1191,

---

[5] At a sidebar conference, the Commonwealth objected to Sedlock's testimony on Petitioner's adaptive behaviors because such testimony is not relevant to a diminished capacity defense. The trial court sustained the objection. (Trial Tr. at 294.) On direct appeal, Petitioner argued that the trial court erred when it did not permit Sedlock to testify about his adaptive skills, arguing that such testimony was relevant to his ability to plan, deliberate and premeditate. The Pennsylvania Supreme Court rejected this claim. It held that "*Sedlock's opinion that [P]etitioner was unable to control his actions and tended to act impulsively was precisely the type of evidence this Court held to be inadmissible, in a similar situation, in [Commonwealth v. Legg, 711 A.2d 430 (Pa. 1998)].* In light of *Legg*, the trial court plainly did not abuse its discretion in sustaining the Commonwealth's objection to this testimony." *VanDivner I*, 962 A.2d at 1183 (emphasis added); *see also Legg*, 711 A.2d at 433 ("psychiatric evidence that a defendant lacked the ability to control his actions or that he acted impulsively is irrelevant and inadmissible on the issue of the defendant's specific intent to kill.")

1218 (Pa. 2006). "Even 'ample evidence' that a defendant 'used mind-altering drugs at the time of the offense,' standing alone, is insufficient because such drugs must be shown to have intoxicated a defendant 'to such an extent that he was unable to form the requisite intent.'" *Saranchak*, 616 F.3d at 307-08 (quoting *Spotz*, 896 A.2d at 1218).

In support of his voluntary intoxication defense, Petitioner presented evidence to show that he drank a large amount of beer and smoked crack cocaine throughout the day of the murder. Petitioner's uncle, Donald VanDivner, testified that he was at a bar with Petitioner from around 11:00 a.m. until 4:00 p.m. on July 5, 2004. Donald said that he drank about seven beers during this time and that Petitioner drank around two beers to every one beer that he drank. (Trial Tr. at 262-65.) Petitioner's brother, Albert VanDivner, was also at the bar with Petitioner that day. Albert testified that he drank beers with Petitioner and that together they smoked an eight ball of crack cocaine. (*Id.* at 269-71.)

At the close of evidence, the trial court charged the jury on the crimes of first- and third-degree murder for Petitioner's killing of Michelle and on the defenses of diminished capacity and voluntary intoxication. The trial court denied the defense's request that the jury also be charged on the crime of voluntary manslaughter (commonly known as heat of passion defense) because the court did "not believe there was any evidence introduced at this trial that would warrant a charge" for that crime. (*Id.* at 314.)

The jury convicted Petitioner of first-degree murder for killing Michelle, attempted homicide and aggravated assault for shooting Billy, and the aggravated assault of Larry. The trial proceeded to the capital sentencing phase of the trial. The Commonwealth presented evidence of two aggravating circumstances: (1) that, in the commission of the offenses, Petitioner knowingly

created a grave risk of death to another person in addition to the victim, 42 Pa.C.S. § 9711(d)(7); and (2) that Petitioner had a significant history of felony convictions involving the use or threat of violence, *id.* § 9711(d)(9). The jurors found both aggravating circumstances and one mitigating circumstance related to Petitioner's character and the circumstances of his offense, *id.* § 9711(e)(8) (commonly referred to as the "catchall" mitigator). The jurors determined that the two aggravating circumstances outweighed the mitigating circumstance. As a result, the jury returned a death sentence on the first-degree murder conviction.

In addition to his capital sentence, the trial court sentenced Petitioner to 20-40 years' imprisonment for the attempted homicide of Billy Cable to be followed by a term of 10-20 years' for the aggravated assault of Larry Newman.[6]

The Pennsylvania Supreme Court affirmed Petitioner's convictions and death sentence in *VanDivner I.* It rejected Petitioner's challenges to the sufficiency and weight of the evidence, several of the trial court's evidentiary rulings, as well as the trial court's rejection of his claim that he was ineligible for the death penalty under *Atkins.* The United States Supreme Court denied a petition for writ of certiorari. *VanDivner v. Pennsylvania*, 130 S. Ct. 2060 (2010).

Petitioner, through counsel with the Federal Public Defender's Office, commenced his first federal habeas action in this Court by moving to appoint counsel, to proceed in forma pauperis, and for a stay of execution. This Court granted those motions and issued a scheduling order. When the due date to file his petition arrived, Petitioner moved for an extension in which he explained

---

[6] The trial court also sentenced Petitioner to a consecutive term of 10-20 years' imprisonment for the aggravated assault of Billy. This sentence was later vacated because Petitioner's convictions for the aggravated assault of Billy and the attempted murder of Billy merged for sentencing purposes.

that he was litigating in state court a counseled petition for collateral relief under Pennsylvania's Post Conviction Relief Act ("PCRA"). Because Petitioner was exhausting his available state court remedies, this Court dismissed his federal habeas case without prejudice to him filing another one at the conclusion of his PCRA proceeding if he did not receive all the relief he sought there.

The trial court, now the PCRA court, held evidentiary hearings on Petitioner's claims on October 24, 2012, November 16, 2012, January 30, 2013 and February 28, 2013. Later, the PCRA court issued an opinion and order in which it denied each of Petitioner's claims. (*See* 1/17/14 PCRA Ct. Op.)

Petitioner, through counsel, appealed. The Pennsylvania Supreme Court reversed the PCRA court's determination that Petitioner failed to prove pre-18 onset of his intellectual disability. *Commonwealth v. VanDivner*, 130 A.3d 676 (Pa. 2015) ("*VanDivner II*"). It remanded the case to consider the two other prongs necessary to succeed on an *Atkins* claim in Pennsylvania: sub-average intellectual functioning (*i.e.*, an IQ of 75 or less) and significant adaptive functioning deficits. *See* footnote 3, *supra*.

On remand, the PCRA once again denied Petitioner's *Atkins* claim. In Petitioner's subsequent appeal, the Pennsylvania Supreme Court "reject[ed] this determination and conclude[d] that, given the evidence presented at the PCRA hearings, combined with the evidence presented at his pretrial *Atkins* hearing, [Petitioner] has demonstrated that he suffers from significant limitations in adaptive behavior. As [Petitioner] has established all three prongs of *Miller* [the Pennsylvania application of *Atkins*]—limited intellectual functioning, significant adaptive limitations, and onset prior to age 18, he has demonstrated that he is intellectually disabled, and ineligible for the death penalty." *Commonwealth v. VanDivner*, 178 A.3d 108, 130

(Pa. 2018) ("*VanDivner III*"). Concluding that Trial Counsel were ineffective assistance for failing to present available evidence to support his pre-trial *Atkins* claim, the Pennsylvania Supreme Court vacated Petitioner's sentence of death and directed that his judgment of sentence for the first-degree murder of Michelle be modified to reflect the imposition of a life sentence. *Id.* Because Petitioner's case was no longer a capital one, the Pennsylvania Supreme Court transferred the appeal to the Pennsylvania Superior Court for disposition of Petitioner's guilt-phase claims. *Id.*

The Superior Court later denied Petitioner's guilt-phase claims in *Commonwealth v. VanDivner*, 2018 WL 6839326 (Pa. Super. Ct. Dec. 13, 2018) ("*VanDivner IV*"). The Pennsylvania Supreme Court denied a petition for allowance of appeal. *Commonwealth v. VanDivner*, 216 A.3d 1019 (Pa. 2019).

Pending before this Court is Petitioner's counseled Petition for a Writ of Habeas Corpus (Doc. 5) in which he raises the following claims, all of which challenge the validity of his first-degree murder conviction:

> I.   Trial Counsel's investigation was constitutionally deficient because it failed to uncover multiple eyewitnesses who lived next door and across the street from Michelle's house; these people would have provided evidence that would have led to a verdict of a lesser degree of guilt for killing Michelle;
>
> II.  The Commonwealth violated the rule of *Brady v. Maryland* when it failed to disclose exculpatory and impeachment evidence known to police;
>
> III. Trial Counsel were ineffective in failing to introduce already-available evidence on diminished capacity;
>
> IV.  Trial Counsel ineffectively failed to uncover and develop readily-available evidence that supported the voluntary manslaughter instruction counsel had requested; and,
>
> V.   Petitioner is entitled to a new trial because of the cumulative prejudicial effect on the errors alleged herein.

11

(Doc. 5 at i-ii.)

Petitioner raised each of these claims in his PCRA proceeding. The Superior Court denied

them on the merits in *VanDivner IV*.

The Commonwealth[7] has filed the state court record and the Answer (Doc. 17) and

Petitioner has filed a Reply (Doc. 20.)

## II.    Discussion

### A.    The Applicable Federal Habeas Statute

The Court has jurisdiction under 28 U.S.C. § 2254, the federal habeas statute applicable to

prisoners in custody pursuant to a state-court judgment. Section 2254 permits a federal court to

grant a state prisoner a writ of habeas corpus "on the ground that he or she is in custody in violation

of the Constitution…of the United States." 28 U.S.C. § 2254(a). Errors of state law are not

cognizable. *Id.*; *see, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

In describing the role of federal habeas proceedings, the United States Supreme Court

noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a
> conviction or sentence.... The role of federal habeas proceedings, while important
> in assuring that constitutional rights are observed, is secondary and limited.  Federal
> courts are not forums in which to relitigate state trials.

*Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).

It is Petitioner's burden to prove that he is entitled to the writ. *See, e.g.*, *Vickers v. Sup't*

*Graterford SCI*, 858 F.3d 841, 848-49 (3d Cir. 2017). There are other prerequisites that he must

satisfy before he can receive habeas relief on his claims (relevant here, the burden imposed on him

---

[7] The Court will refer to Respondents as the "Commonwealth."

by the standard of review enacted by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which is codified at 28 U.S.C. § 2254(d) and is discussed in the next section), but, ultimately, Petitioner cannot receive federal habeas relief unless he shows that he is in custody in violation of his federal constitutional rights. 28 U.S.C. § 2254(a); *see, e.g.*, *Vickers*, 858 F.3d at 849.

Even if a constitutional error is found in a habeas case the petitioner is not entitled to relief if the error was harmless. In habeas cases, the harmless error analysis is that which is set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under *Brecht*, an error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Importantly, the *Brecht* harmless error analysis is not necessary when it is subsumed in the substantive constitutional test at issue, such as it is with an ineffective assistance of counsel claim (Claims I, III and IV) and *Brady* claims (Claim II). *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (the prejudice prong of an ineffective assistance claim and the *Brecht* harmless error are essentially the same standard); *Rodriguez v. Sec'y, Florida Dept. of Corr.*, 756 F.3d 1277, 1303 (11th Cir. 2014) ("We do not conduct a *Brecht* inquiry when analyzing a *Brady* claim because the latter subsumes the former.").

### B.    Standard of Review

In 1996, Congress made a number of significant amendments to the federal habeas statutes with the enactment of AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). AEDPA reflects the view that

habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotations and citation omitted).

Prior to AEDPA's enactment, a federal court applied a de novo standard of review to questions of law and mixed questions of law and fact.[8] AEDPA put into place a new standard of review, which is codified at 28 U.S.C. § 2254(d). Here, it applies "to any claim that was adjudicated on the merits" by the Superior Court in *VanDivner IV*[9] and prohibits this Court from granting habeas relief on a claim unless Petitioner first establishes that the Superior Court's "adjudication of the claim":

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

If this Court determines that Petitioner has satisfied either § 2254(d)(1) or (2), it then "must proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred." *Vickers*, 858 F.3d at 849 (citing *Lafler v. Cooper*, 566 U.S. 156, 174 (2012)). That is because "a

---

[8] A finding of fact made by a state court has always been afforded considerable deference in a federal habeas proceeding. AEDPA continued that deference at provisions codified at 28 U.S.C. § 2254(d)(2) and § 2254(e)(1). Section 2254(d) is discussed below. As for § 2254(e)(1), which applies to any factual finding made by a state court, it mandates that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). A petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

[9] When applying § 2254(d), the federal habeas court considers the "last reasoned decision" of the state courts to have adjudicated the petitioner's claim. *Brown v. Sup't Greene SCI*, 834 F.3d 506, 512 (3d Cir. 2016); *Simmons v. Beard*, 590 F.3d 223, 231-32 (3d Cir. 2009). In this case, that is the Superior Court's decision in *VanDivner IV*.

federal court can only grant the Great Writ if it is 'firmly convinced that a federal constitutional right has been violated[.]'" *Id.* (citing *Williams*, 529 U.S. at 389, and *Horn v. Banks*, 536 U.S. 266, 272 (2001) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review…none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard")).

    **(1)**      **Application of § 2254(d)(1)**

        **(a)**      **"Clearly established Federal law"**

In applying § 2254(d)(1), this Court's first task is to ascertain what law falls within the scope of the "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1). It is "'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" *Dennis v. Sec'y, Pennsylvania Dept. of Corr.*, 834 F.3d 263, 280 (2016) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).[10] It "includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" *White v. Woodall*, 572 U.S. 415, 420 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012), which quoted *Williams*, 529 U.S. at 412).

---

[10]  The Supreme Court "has repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam) (quoting § 2254(d)(1) and citing *Lopez v. Smith*, 574 U.S. 1 (2014) (per curiam)). *See, e.g.*, *Renico v. Lett*, 559 U.S. 766, 779 (2010) (state court's failure to apply decision by federal circuit court "cannot independently authorize habeas relief under AEDPA."). Additionally, "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced.'" *Lopez*, 574 U.S. at 2 (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam)).

**(b)**     **The "contrary to" clause**

Once the "clearly established Federal law, as determined by the Supreme Court of the United States," is ascertained, this Court must determine whether the Superior Court's adjudication of the claim at issue was "contrary to" that law. *Williams*, 529 U.S. at 404-05 (explaining that the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) have independent meaning). A state-court adjudication is "contrary to…clearly established Federal law, as determined by the Supreme Court of the United States" § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams*, 529 U.S. at 405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," *id.* at 406.

A "run-of-the-mill" state-court adjudication applying the correct legal rule from Supreme Court decisions to the facts of a particular case will not be "contrary to" Supreme Court precedent. *Williams*, 529 U.S. at 406. In such cases, the issue for the federal habeas court's evaluation of the petitioner's claim will center on whether he has satisfied § 2254(d)(1)'s "unreasonable application of" clause.

**(c)**     **The "unreasonable application of" clause**

"A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'" *Dennis*, 834 F.3d at 281 (quoting *Williams*, 529 U.S. at 413). To satisfy his burden under this provision of AEDPA's standard of review, Petitioner must do more than convince this Court that the Superior Court's decision was incorrect. *Id.* He must show that it

"'was *objectively* unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 409) (emphasis added by Court of Appeals). This means that Petitioner must show that the Superior Court's adjudication of a claim "*was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*" *Richter*, 562 U.S. at 103 (emphasis added).

> As the Supreme Court has explained:

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *See Lockyer, supra*, at 75, 123 S. Ct. 1166. If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

*Id.* at 102.

### (2)    Application of § 2254(d)(2)

The standard of review set forth at § 2254(d)(2) applies "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim[.]" *Burt v. Titlow*, 571 U.S. 12, 18 (2013). "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings."[11] *Dennis*, 834 F.3d at 281 (quoting § 2254(d)(2) and citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

---

[11]  Since AEDPA's enactment, federal courts have debated how to harmonize §§ 2254(d)(2) and (e)(1). They "express the same fundamental principle of deference to state court findings[,]" and
*Footnote continued on next page…*

"'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)); *see Rice v. Collins*, 546 U.S. 333, 342 (2006) (reversing court of appeals' decision because "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus."). Thus, "if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede'" the state court's adjudication. *Wood*, 558 U.S at 301 (quoting *Collins*, 546 U.S. at 341-42). "[H]owever, '[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (quoting *Miller-El*, 537 U.S. at 340); *see also Dennis*, 834 F.3d at 281.

### C.    Ineffective Assistance Claims

Petitioner's ineffective assistance of counsel claims (Claims I, III and IV) are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* recognized that a defendant's Sixth Amendment right to the assistance of counsel for his defense entails the right to be represented by an attorney who meets at least a minimal standard of competence. 466 U.S.

---

federal habeas courts "have tended to lump the two provisions together as generally indicative of the deference AEDPA requires of state court factual determinations." *Lambert v. Blackwell*, 387 F.3d 210, 235 (3d Cir. 2004). The Supreme Court has not yet "defined the precise relationship between" these two provisions of AEDPA. *Titlow*, 571 U.S. at 18. In *Lambert*, the United States Court of Appeals instructed that § 2254(d)(2), when it applies, provides the "overarching standard" that a petitioner must overcome to receive habeas relief. 387 F.3d at 235. Section 2254(e)(1) applies to "specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision." *Id.*
.

at 685-87. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" *Titlow*, 571 U.S. at 24.

Under *Strickland*, it is Petitioner's burden to establish that his "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. The Supreme Court has emphasized that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'" *Titlow*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690); *Richter*, 562 U.S. at 104 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting *Strickland*, 466 U.S. at 689).

*Strickland* also requires that Petitioner show that he was prejudiced by his trial counsel's deficient performance. This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A 'reasonable probability' means one 'sufficient to undermine confidence in the outcome' of the proceeding." *Wharton v. Sup't Graterford SCI*, 95 F.4th 113, 123 (3d Cir. 2024) (quoting *Strickland*, 466 U.S. at 694, 697). "It is a lower standard than a preponderance of the evidence, but that distinction matters 'only in the rarest case.'" *Id.* (quoting *Richter*, 562 U.S. at 112).

Importantly, the Supreme Court in *Strickland* explained that although it had discussed the performance component of an ineffectiveness claim before the prejudice component, there is no reason for an analysis of an ineffectiveness claim to proceed in that order. 466 U.S. at 697. Thus,

if it is more efficient to dispose of an ineffectiveness claim on the ground that the petitioner failed to meet his burden of showing prejudice, the court should only address that prong of *Strickland*. *Id.* ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.")

*Strickland* represents the "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), in which to analyze the Superior Court's adjudication of each of Petitioner's ineffective assistance claims under AEDPA's standard of review. Pennsylvania law recognizes that the *Strickland* standard applies to ineffective assistance of counsel claims. *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117-18 (Pa. 2012) ("In order to obtain relief on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland*[.]"); *Commonwealth v. Kimball*, 724 A.2d 326 (Pa. 1999). The Superior Court correctly set forth the *Strickland* standard in *VanDivner IV*, 2018 WL 6839326, at *4-5.[12]

---

[12] Pennsylvania courts typically articulate *Strickland's* standard in three parts while federal courts set it out in two. The legal evaluation is the same, and the differences merely reflect a stylistic choice by state courts. *Commonwealth v. Mitchell*, 105 A.3d 1257, 1266 (Pa. 2014) ("With regard to ineffective assistance of counsel claims, the test we utilize in Pennsylvania is substantively the same as the performance-and-prejudice standard set forth in *Strickland*… although this Court has divided the performance component into sub-parts dealing with arguable merit and reasonable strategy. [A petitioner] must, therefore, show that: the underlying legal claim has arguable merit; counsel had no reasonable basis for his act or omission; and [the petitioner] suffered prejudice as a result."); *see also Tyson v. Sup't Houtzdale SCI*, 976 F.3d 382, 391 (3d Cir. 2020) ("Pennsylvania's test for ineffective assistance of counsel is consistent with the Supreme Court's decision in *Strickland* because it requires findings as to both deficient performance and actual prejudice.").

### (1)    Failure to Interview and Present at Trial Testimony From Multiple Eyewitnesses

In Claim I, Petitioner contends that Trial Counsel provided him with ineffective assistance because they failed to interview and present at trial testimony from these neighbors of Michelle: sisters Cheree and Jessica Parrill and their mother Kim Ropejko; Chrissie Newman;[13] and, Victor Chamberlain. Petitioner asserts that but for Trial Counsels' deficient performance in this regard, there is a reasonable probability that the jury would have convicted him of voluntary manslaughter or third-degree murder in the killing of Michelle.

The Superior Court denied Claim I on the merits. As explained above, the Superior Court set forth the correct *Strickland* standard in *VanDivner IV*, 2018 WL 6839326, at *4-5. Petitioner argues that the Superior Court's analysis of Claim I "went off the rails" when discussing this particular claim, however, because "it added additional requirements that are contrary to *Strickland* and its progeny." (Doc. 5 at 27.)

The Court will assume without deciding that the Superior Court applied a rule that was "contrary to" *Strickland* and will therefore review this claim de novo. The Court will do so because when the Superior Court adjudicated this claim it relied in part on the PCRA court's determination that Petitioner failed to establish that some of the witnesses at issue were willing to testify for the defense at the trial. *VanDivner II*, 2018 WL 6839326, *7. The Superior Court also applied to this claim only a five-factor test that the Court of Appeals has observed "derive[s] not from federal law, but from a Supreme Court of Pennsylvania decision setting forth five-factor test of uncertain origin." *Williams v. Sup't Mahanoy SCI*, 45 F.4th 713, 720 (3d Cir. 2022). This five-factor test

---

[13] Her full name is Kristen Dawn Newman. In the PCRA transcript, her diminutive is recorded as "Chrissie."

requires the petitioner to show that: (1) the witness existed; (2) the witness was available to testify; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness prejudiced the defense. *VanDivner IV*, 2018 WL 6839326, at *6. The Court of Appeals has held that the fourth requirement—showing a witness's willingness to testify—does not align with the *Strickland* standard and is "irrelevant since defense counsel can compel testimony through a trial subpoena." *Williams*, 45 F.4th at 720.

Under de novo review, the Court concludes that Petitioner is not entitled to relief on Claim I because he has not shown that he was prejudiced by Trial Counsels' failure to interview and present testimony at trial from Cheree and Jessica Parrill, Chrissie Newman, Victor Chamberlain and Kim Ropejko. Petitioner maintains that if counsel had interviewed these witnesses during their investigation and when formulating their trial strategy, and if counsel had presented testimony from them at the trial, there is a reasonable probability that the jury would have convicted him of voluntary manslaughter or third-degree murder. The Court is not persuaded. To understand why, a summary of the testimony given at the PCRA hearings by these individuals is required.

Cheree and Jessica Parrill and their mother Kim Ropejko lived across the street from Michelle. Cheree testified at the PCRA hearing that she saw Petitioner shoot Michelle. (PCRA Hr'g Tr., 1/30/13, at 13.) She said that Michelle was running away from Petitioner and that he was standing about 12 to 15 feet from Michelle when he fired the fatal shot into her head. (*Id.* at 14-15.) Cheree did not observe Petitioner grab Michelle's hair. She said that "he wasn't close enough to do that." (*Id.* at 16; *id.* at 17 "he never touched her.")

When Cheree was asked at the PCRA hearing if she saw Michelle fall to the ground, Cheree responded: "I don't remember. Last thing I remember is she threw her hands up in the air and then I ran into the house to call…my grandmother." (*Id.*) Cheree said that she did not see Michelle's daughter, Jessica Cable, when the shooting occurred. She said the first time she saw Jessica Cable was when she (Jessica) was running through the alley after Petitioner shot Michelle and she was yelling "my mother is shot, my mother is shot[!]" (*Id.* at 18-19.)

Cheree also said she saw Jessica Cable two days after the shooting. Cheree tried to comfort Jessica, who was crying. Cheree said that Jessica said to her that if the police came to interview her (which they never did) to "remember I [Jessica] was there, I seen everything. How can he do this to my mom?" (*Id.* at 23.)

Cheree's sister, Jessica Parrill, also testified at the PCRA hearing that she saw Petitioner shoot Michelle. (PCRA Hr'g Tr., 10/24/12 (afternoon), at 71.) She was thirteen years old at the time of the shootings. (*Id.* at 86.) Jessica Parrill said that she saw Petitioner chasing Michelle and "[t]here was just so much ruckus at the time of the shootings." (*Id.* at 74.) Similar to Cheree, Jessica Parrill testified that Petitioner was standing about 10 feet from Michelle when he shot her. (*Id.* at 74, 87, 89-90.) Jessica Parrill did not hear Petitioner say anything during the incident, nor did she see Petitioner grab Michelle by the hair. (*Id.* at 74-77.) The first time she saw Jessica Cable was a few minutes after the shooting, when Jessica Cable was running toward her mother's body. (*Id.* at 78-81.)

Chrissie Newman was married to Kenny at the time of the shootings and lived with him across the street from Michelle. (*Id.* at 23.) She saw the fight on the sun porch. She testified at the PCRA hearing that when Petitioner was pointing his gun at Larry on the sun porch he "had

Michelle by the hair" and Michelle tried to get away from him. (*Id.* at 29, 44-45, 49-50.) She said that Michelle broke free from Petitioner and started running toward the side of the house. According to Chrissie, Petitioner shot at Larry and "then took a shot at Kenny." (*Id.* at 51-52; *id.* at 60-61.) Chrissie said that Petitioner yelled at Michelle to come back and that when Michelle did so Petitioner shot her from a distance of about 10 to 12 feet. (*Id.*) Chrissie did not see Jessica Cable until after Michelle was shot. (*Id.* at 34-40, 57.) She did not hear Petitioner say anything to Michelle when he shot her, but she did hear him call Michelle a bitch when he was holding her by the hair on the sun porch. (*Id.* at 32, 44-46, 51, 56, 61-62.)

Victor Chamberlain also lived near the Cables. He did not witness the shootings. He testified at the PCRA hearing that the day of the shootings he heard what he at first assumed where firecrackers. (PCRA Hr'g Tr., 11/16/12, at 144.) When he went out his front door he saw another neighbor, Donnie Metts, who was either consoling or preventing Jessica from going to her mother's body. (*Id.* at 145, 148.) Victor heard Jessica say that Petitioner shot her mother. (*Id.* at 146.) He said he heard Jessica's statements about five minutes after the "pops" he learned where gunshots. (*Id.* at 146, 151-52.)

Cheree and Jessica Parrill's mother, Kim Ropejko, did not witness the shootings either. She testified at the PCRA hearing about incidents leading up to the shootings. Kim said that a few days before July 5, 2004, she witnessed Michelle and Larry arguing with Petitioner outside. She saw Larry stand in the middle of the street and taunt Petitioner to run him over. Kim said Petitioner ignored Larry and drove by him. (*Id.* at 159.)

Kim also said that around 12 hours before the shootings (that is, around 8:00 a.m. on July 5, 2004), Michelle and Larry came to her home. (*Id.* at 160.) This morning visit lasted a few

hours and during it Michelle and Larry drank alcohol and, according to Kim, the two of them called Petitioner about 10 to 15 times. (*Id.* at 161.) During those calls, Kim said, Larry told Petitioner that he was sleeping with Michelle, that "he [Petitioner] didn't know what he was missing[,]" and that he should "come on down." (*Id.* at 159-61.)

Petitioner asserts that if Trial Counsel had interviewed and presented testimony from these witnesses that his defense could have discredited Jessica Cable's version of events. He asserts that the PCRA testimony given by Cheree and Jessica Parrill, Chrissie Newman and Victor Chamberlain support his contention that Jessica did not actually see Petitioner shoot Michelle. In fact, Petitioner claims, Jessica Cable was not even at the scene when Petitioner shot her mother in the head. Petitioner argues that Jessica Cable's "lies," which he claims allowed the Commonwealth to portray Petitioner's shooting of Michelle as an unprovoked, execution-style killing "transformed this case from a killing in the heat of passion to a fact pattern that led to a first-degree murder conviction." (Doc. 5 at 25.)

The Court is not persuaded by Petitioner's argument. Jessica's trial testimony was, in relevant part, consistent with that given by Patrick Rimel, who also testified that he saw Petitioner grab Michelle by her hair and shoot her in the head. (Trial Tr. at 115-30.) Both Jessica's and Patrick Rimel's testimonies were corroborated by Dr. Wecht's expert opinion that the gun used to kill Michelle was fired from within a foot and a half of her head (*id.* at 241) and was "a near contact wound[.]"[14] (*Id.* at 245.)

---

[14] To corroborate his PCRA witnesses' testimony that he was standing about 10 to 15 feet from Michelle when he shot her, Petitioner presented testimony during the PCRA hearing from pathologist Charles Wetli, M.D. He testified that in his expert opinion Petitioner shot Michelle from "[w]ell beyond two feet away[,]" and that it was not a contact or near contact shot. (PCRA *Footnote continued on next page…*

In any event, under the collective version of events as described by Petitioner's PCRA witnesses, Petitioner called Michelle a bitch at some point, she was running from him and he was standing between 10 to 15 feet from her when he shot her. Petitioner has not convinced the Court that if Trial Counsel had interviewed his PCRA witnesses when formulating the defense's trial strategy and presented testimony from them at trial that there is a reasonable probability that the outcome of his trial would have been different.

Petitioner's repeated assertion that his PCRA witnesses proved that Jessica Cable "lied" when she testified at trial is also unfair and unpersuasive. The testimonies from Cheree and Jessica Parrill, Chrissie Newman and Victor Chamberlain reflect the chaos surrounding the shootings at Michelle's house the evening of July 5, 2004. They show that, as with many cases, witnesses who observed the same event have quite different recollections as to what exactly occurred. Those differences do not always matter, and they do not here. Many individuals witnessed the events that occurred around the shootings and there was never any question that Petitioner was the one who shot Michelle. Petitioner's unsupported suggestion that Jessica Cable was motivated to lie about what she saw because it might affect his degree of guilt for shooting her mother in the head and killing her, or that she tried to get Cheree to "join her in her falsehood" (Doc. 5 at 22) when she allegedly told Cheree two days after the shooting "remember I was there, I seen everything," (PCRA Hr'g Tr., 1/30/13, at 23), is completely unconvincing.

As for Kim Ropejko, Petitioner argues that her testimony could have been introduced to support a voluntary manslaughter instruction, since she could have testified that she witnessed

---

Hr'g Tr., 10/24/12 (morning), at 113; *id.* at 109, 115-17.) Petitioner does not claim that Trial Counsel was ineffective for not presenting similar expert testimony at trial to challenge the expert opinion given by Dr. Wecht, however.

Michelle and Larry "taunting" Petitioner. This argument is not persuasive because the last event that Kim Ropejko observed (Michelle and Larry calling Petitioner the morning of July 5, 2004 and allegedly taunting him about their alleged sexual relationship) happened many hours before Petitioner drove to Michelle's house and shot and killed her. Therefore, Kim's testimony would not have supported a finding that Petitioner lacked enough cooling off time between the provocation she observed and Petitioner's shooting of Michelle.[15] Thus, Petitioner has not shown a reasonable probability that the outcome of his proceeding would have been different had Trial Counsel presented testimony at trial from Kim Ropejko either, even when her proposed testimony is considered together with the proposed testimony Petitioner claims Cheree and Jessica Parrill, Chrissie Newman and Victor Chamberlain could have offered at the trial.

Finally, the Court must also "consider the strength of the evidence" supporting a first-degree murder conviction in conducting any prejudice inquiry. *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999). Here, Petitioner drove to Michelle's home with a loaded gun, asked where she was and then shot her in the head (either from close range or, as Petitioner maintains, from a distance of about 10 to 15 feet). Moments later Petitioner went to the back of the home, aimed his gun at Billy and shot him in the neck. Petitioner then got back into his Chevy Blazer, fled the scene and hid in a wooded area until he was apprehended by the police two days later. He gave statements to the police evidencing his guilt and that he understood what he had done. Given the strength of the evidence that Petitioner committed first-degree murder, he has not established that there is a

---

[15]  As discussed below, one of the elements a defendant must prove to successfully argue heat of passion voluntary manslaughter is that he lacked a sufficient cooling off time between the provocation and the killing. *VanDivner IV*, 2018 WL 6839326, at *10.

reasonable probability that the outcome of his trial would have been different but for Trial Counsels' failure to interview and present at trial testimony from all the witnesses at issue.

For all these reasons, Claim I is denied.

### (2) Failure to Introduce Already-Available Evidence of Diminished Capacity

As discussed above, psychologist Adam C. Sedlock and Dr. Bernstein testified at the pre-trial hearing on whether *Atkins* barred imposing the death penalty if the jury convicted Petitioner of first-degree murder. Sedlock also testified at the guilt phase of Petitioner's trial to support Petitioner's separate diminished capacity defense, which the jury rejected. In Claim III, Petitioner asserts that Trial Counsel were ineffective because they should have elicited additional testimony from Sedlock and also presented testimony at trial from Dr. Bernstein to support his diminished capacity defense.

Specifically, Petitioner faults Attorney Harper for not explicitly asking Sedlock during his guilt-phase testimony whether Petitioner's intellectual impairments could have prevented him from forming the specific intent to kill.[16] He also faults Attorney Harper for not eliciting from Sedlock testimony similar to what he gave at the pre-trial *Atkins* hearing. At that hearing, Sedlock opined about Petitioner's low intellectual functioning and organic brain damage. Sedlock also discussed studies about the intellectual disability that Petitioner has, which makes him more prone to "difficulties with impulse control than the general population." (*Atkins* Hr'g Tr., 11/27/06, at 82-83; *see also id.* at 69, 71, 76.)

---

[16] In her closing argument, the prosecutor noted that Sedlock did not testify that Petitioner could not form the specific intent to kill. (Trial Tr. at 245-46.)

As for Dr. Bernstein, Petitioner similarly asserts that Trial Counsel should have called him during the guilt phase of the trial to give testimony similar to what he gave at the *Atkins* pre-trial hearing. Dr. Bernstein opined at that hearing that Petitioner had some dementia, poor decision-making skills, a history of childhood learning disabilities, a history of polysubstance and alcohol abuse (*Id.* at 8-11) and deficits to the area of the brain "that is involved with the modulation of behavior." (*Id.* at 34.)

Petitioner contends that objectively reasonable counsel would have presented the above-cited testimony from Dr. Bernstein and Sedlock at trial to support his diminished capacity defense. If Trial Counsel had done so, Petitioner argues, Dr. Bernstein and Sedlock could have given testimony similar to that given at the PCRA hearing by psychologist Kristine M. Jacquin.

Jacquin testified at the PCRA hearing to support Petitioner's *Atkins* claim. (PCRA Hr'g Tr., 11/16/12, at 28; *see also* Amend. PCRA Pet., Ex. 25 (Jacquin's Report)). Petitioner directs this Court to Jacquin's PCRA hearing testimony in which she explained that "intelligence" or "intellectual functioning" includes "conceptual thinking, problem solving, planning." (*Id.* at 50.) "Executive functioning," Jacquin explained, asks "can you plan, can you organize, can you reason[?]" (*Id.* at 90.) She also stated that "it's very difficult for someone who has impairment in executive functioning to anticipate consequences." (*Id.* at 50.) In her report, Jacquin noted that "impulse control problems combined with neuropsychological test results showing poor executing functioning suggests that [Petitioner] would have great difficult planning criminal behavior.

Instead, [Petitioner's] aggressive behaviors and other criminal acts *are likely to be committed impulsively*." (Amend. PCRA Pet., Ex. 25 at 41-42) (emphasis added).[17]

In denying Claim III, the Superior Court questioned the actual relevance of the evidence Petitioner relied on to support it by noting the extremely limited nature of the diminished capacity defense under Pennsylvania law. The Superior Court explained:

> Psychiatric testimony that addresses mental disorders affecting cognitive functions of deliberation and premeditation necessary to formulate a specific intent is admissible. *However, psychiatric evidence that a defendant lacked the ability to control his actions or that he acted impulsively is irrelevant and inadmissible on the issue of the defendant's specific intent to kill.*

*VanDivner IV*, 2018 WL 6839326, at *9 (internal quotation and citation omitted, emphasis added).[18] Thus, much of the evidence that Petitioner relies on (that is, the pre-trial hearing

---

[17]  The PCRA court refused to admit Jacquin's report into evidence at the PCRA hearing and it expressly found her "not credible." (PCRA Op., 1/17/14, at 2.) Ordinarily, this Court would be bound by that credibility determination. 28 U.S.C. § 2254(e)(1); *Vickers*, 858 F.3d at 850 (even in pre-AEDPA cases, "'federal habeas courts [had] no license to redetermine credibility of witnesses whose demeanor ha[d] been observed by the state trial court, but not by them,'") (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (bracketed text added by the court of appeals).) But the Pennsylvania Supreme Court cited Jacquin's report and PCRA testimony when it granted Petitioner relief on his *Atkins* claim. Thus, this Court will consider the testimony and report given by Jacquin during the PCRA hearing that Petitioner cites in support of his claims for federal habeas relief.

[18]  The Superior Court also noted that although Petitioner demonstrated he was intellectually disabled he "cite[d] no authority that a finding of an intellectual disability equates, in all instances, to a 'mental disorder' that would prevent him from forming the specific intent to kill." *VanDivner IV*, 2018 WL 6839236, at *9. Petitioner argues that by making this observation the Superior Court placed on him a more onerous burden than that imposed by Pennsylvania law, which does not require that a defendant show that his intellectual disability "in all instances" would prevent him from forming the specific intent to kill. Petitioner's argument does not present a fair representation of the Superior Court's holding, however. The Superior Court was merely making the point that although Petitioner had shown in his PCRA proceeding that he was intellectually disabled such that he could not face a sentence of death under *Atkins*, that fact alone was not sufficient to support the separate and distinct claim that there was additional available evidence Trial Counsel should have developed to support his diminished capacity defense to the crime of first-degree murder.

testimony from Dr. Bernstein and Sedlock and the PCRA hearing testimony and report of Jacquin in which they discuss Petitioner's impulse control) is not relevant to whether he could form the specific intent to kill and commit first-degree murder. *See, e.g.*, *VanDivner I*, 962 A.2d at 1183 ("psychiatric evidence that a defendant lacked the ability to control his actions or that he acted impulsively,' for example, 'is irrelevant and inadmissible on the issue of the defendant's specific intent to kill.") (internal quotation and citation omitted); *Commonwealth v. Taylor*, 876 A.2d 916, 926 (Pa. 2005) ("[W]e have repeatedly rejected the contention that evidence of a defendant's supposed inability to control his actions—by virtue of an 'irresistible impulse,' a 'compulsion,' or otherwise—is relevant to negate specific intent, and we have consistently held that such evidence may not be admitted in support of a diminished capacity defense.") (citation omitted); *Commonwealth. v. Mason*, 130 A.3d 601, 631-32 (Pa. 2015) (evidence that the defendant was "low functioning," his IQ was "barely above the [intellectually disabled] level," he had "learning difficulties" did not suggest his "cognitive abilities of deliberation and premeditation were so compromised by mental defect that he was unable to formulate the specific intent to kill, much less that he suffered from such mental deficit at the time of the stabbing.")[19]

Petitioner also relies on Jacquin's PCRA hearing testimony in which she stated that "intelligence or intellectual functioning" relates to "conceptual thinking, problem solving, *planning*." (PCRA Hr'g Tr., 11/16/12, at 50) (emphasis added.) He cites Jacquin's report, in which

---

[19]    Although Petitioner faults Trial Counsel for not asking Sedlock during the trial whether Petitioner could have formed the specific intent to kill, Petitioner has not directed the Court to any testimony from Jacquin during the PCRA hearing in which she opined that Petitioner was incapable of forming the specific intent to kill Michelle. Moreover, conclusory expert testimony on an ultimate fact, such as the non-existence of specific intent, is improper under Pennsylvania law if the testimony is unsupported by the expert's underlying testimony. *See, e.g.*, *Woo v. Beard*, 2006 WL 3813986, *4-6, 10-11 (W.D. Pa. Dec. 27, 2006).

she stated that Petitioner "would have great difficult planning criminal behavior. Instead, for [Petitioner], aggressive behaviors and other criminal acts are likely committed *impulsively*." (Amended PCRA Pet. Ex. 25 at 41-42 (emphasis added)). Once again, evidence that Petitioner acted impulsively does not support a diminished capacity defense.

Additionally, under Pennsylvania law, the specific intent to kill "can be formulated in a fraction of a second[,]" and also "can be inferred from the circumstances surrounding an unlawful killing[,]" including when the "accused used a deadly weapon to inflict injury to a vital part of the body." *Commonwealth v. Donnelly*, 653 A.2d 35, 75 (Pa. Super. Ct. 1995) (internal citation and quotation omitted); *Commonwealth v. Hitcho*, 123 A.3d 731, 746 (Pa. 2015) ("the period of reflection required for premeditation to establish the specific intent to kill may be very brief; in fact the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death."). Thus, Jacquin's opinion about Petitioner's ability to "plan" is not particularly persuasive evidence of his diminished capacity under the circumstances, especially considering the other evidence that Petitioner acted with the specific intent to kill Michelle.

In any event, the Superior Court ultimately determined that Petitioner failed to establish that he was prejudiced by Trial Counsel's alleged ineffectiveness. *VanDivner IV*, 2018 WL 6839326, at * 9. The Superior Court pointed out that the jury heard testimony from Sedlock about Petitioner's "low IQ, the fact that he exhibited damages to that part of his brain that controls thinking before acting, as well as a history of [Petitioner's] head trauma[,]" and was not persuaded by it. *Id.* (citing Trial Tr. at 283-91.) It also noted the statements Petitioner made to the police after he was apprehended that evidenced his awareness of what he had done and his ability to

comprehend and appreciate the consequences of his actions, all of which cuts against Petitioner's contention that his intellectual impairments were such that he was incapable of acting with the specific intent to kill. *Id.*

Although the Court would deny Claim III even under a de novo review, Petitioner has not met his initial burden of showing that habeas relief is not prohibited by AEDPA's standard of review at § 2254(d). The Superior Court correctly set forth *Strickland's* prejudice analysis at the beginning of its discussion of Petitioner's ineffectiveness claims, *VanDivner IV*, 2018 WL 6839326, at *5, and there is no basis for this Court to conclude that it did not apply that standard when it evaluated this claim. Thus, the Superior Court's adjudication of this claim was not "contrary to" *Strickland*, 28 U.S.C. § 2254(d)(1). *Williams*, 529 U.S. at 406; *see, e.g.*, *Mosley v. Att'y Gen. Pennsylvania*, 2022 WL 101932, at *2 (3d Cir. Jan. 11, 2022) ("Pennsylvania's ineffective assistance test is not contrary to *Strickland*.") (citing *Mathias v. Sup't Frackville SCI*, 876 F.3d 462, 476 (3d Cir. 2017)). Nor was the Superior Court's decision "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Thus, the Superior Court's decision was not an "unreasonable application of," 28 U.S.C. § 2254(d)(1), the *Strickland* prejudice standard either. Finally, Petitioner has not shown that the Superior Court's decision was based on an unreasonable determination of the facts. *Id.* § 2254(d)(2).

In any event, as noted above, this Court concludes that Claim III fails even under de novo review. Considering the strength of the evidence that Petitioner acted with the specific intent to kill Michelle and committed first-degree murder against the quality of evidence he relies on to support his contention that he was unable to form the specific intent to kill (which is either not

relevant or not particularly persuasive evidence of diminished capacity under Pennsylvania law), he has not shown that there is a reasonable probability that, if Trial Counsel had done all the things he asserts they should have done in Claim III, the outcome of his trial would have been different.

For all of these reasons, Claim III is denied.

### (3)    Failure to Uncover and Present Readily-Available Evidence that Supported the Voluntary Manslaughter Instruction

As noted earlier, Trial Counsel requested a jury instruction on the crime of voluntary manslaughter but the trial court denied that request. In Claim IV, Petitioner contends that Trial Counsel were ineffective for failing to present allegedly readily-available evidence that he claims would have supported the requested instruction. Had Trial Counsel presented this evidence, Petitioner argues, there is a reasonable probability that the jury would have convicted him of voluntary manslaughter and not first-degree murder for killing Michelle.

In support of this claim, Petitioner once again faults Trial Counsel for not interviewing and presenting at trial testimony from Kim Ropejko. As explained during the Court's discussion of Claim I, Kim testified at the PCRA proceeding that a few days before Petitioner shot Michelle, Larry Newman was standing in the middle of the street taunting Petitioner to run him over. Kim also testified that about 12 hours before the shootings she witnessed Michelle and Larry call Petitioner around 10 to 15 times and harass him by telling him that Larry was sleeping with Michelle. (PCRA Hr'g Tr., 11/16/12, at 159-61.)

Petitioner also points out that Trial Counsel had in discovery a police report detailing an interview with his sister-in-law, Kimberly VanDivner. She told police that the day before the shootings she overheard a phone call between Michelle and Petitioner. According to Kimberly VanDivner, during this call Michelle said to Petitioner that "Dave [Metts] was going to make a

bitch out of you. Dave was going to butt fuck you." (PCRA Hr'g Def. Ex. 24; PCRA Hr'g Tr., 1/30/13, at 187-88.) Petitioner points to this alleged phone call as support for his contention that Michelle provoked him by threatening him with anal rape.

In denying this claim, the Superior Court first explained that for Petitioner to have succeeded in convincing the jury that he was guilty not of first-degree murder but only of voluntary manslaughter, he would have to have persuaded the jury that: (1) there was provocation on the part of the victim;[20] (2) that a reasonable person who was confronted with the provoking events would become impassioned to the extent that his mind was incapable of cool reflection; and (3) he *did not have a sufficient cooling off time between the provocation and the killing. VanDivner IV*, 2018 WL 6839326, at *10 (internal citations and quotations omitted) (emphasis added).

The Superior Court then determined, among other things, that Petitioner failed to satisfy *Strickland's* prejudice prong. *Id.* at *11. It so held because the last incident of provocation (the phone calls between Michelle, Larry and Petitioner the morning of July 5, 2004) occurred about twelve hours before the shootings and thus there was an absence of evidence to show that he did not have an adequate cooling off time between the provocation and the killing of Michelle.[21] *Id.*

---

[20]   A defendant can claim under Pennsylvania law that he was acting under a sudden and intense passion resulting from serious provocation by another person whom he was trying to kill but that he negligently or accidentally killed the victim. Petitioner does not claim that scenario might have applied to his case, and there is no basis to conclude that it would have.

[21]   Petitioner faults the Superior Court for not considering, when it evaluated Claim IV, evidence about an event that allegedly occurred closer to the shootings. This evidence is addressed below in the discussion of Petitioner's *Brady* claim (Claim II). It relates to the statement given by an individual named Randy Price to the police. (Pet's PCRA Hr'g Ex. 23.) In his statement, Randy discussed what he observed when he was at Michelle's house the day of the shooting. He stated that Larry was very drunk. He also described a phone call that Petitioner made to the house that day. Randy answered the call and during their discussion Petitioner told Randy that he was "going *Footnote continued on next page…*

(citing *Commonwealth v. Mason*, 130 A.3d 601629 (Pa. 2015) ("the passage of time between provocation and the 'passion' must be viewed as a cooling period, and killings will not be deemed to have occurred under the heat of passion where there was sufficient time for cooling between whatever provocation might have existed and the actual killings").

There is no basis for the Court to conclude that the Superior Court applied the wrong prejudice standard when it evaluated this claim. Thus, its adjudication was not "contrary to" *Strickland*. 28 U.S.C. § 2254(d)(1). Nor has Petitioner shown that the Superior Court's adjudication "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103 (emphasis added). Thus, the Court cannot conclude that the Superior Court's adjudication was an "unreasonable application of" *Strickland's* prejudice prong. 28 U.S.C. § 2254(d)(1).

The only remaining question for this Court, then is whether Petitioner has shown that the Superior Court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" *Id.* § 2254(d)(2). He has not met his burden here either.

---

to come down there and kill all youns." (*Id.* at 2.) Randy then handed Michelle the phone and she and Petitioner argued for about five minutes. (*Id.*)

Trial Counsel cannot be faulted for failing to introduce this evidence to support a voluntary manslaughter defense since it was, as Petitioner maintains, suppressed by the Commonwealth. Thus, there was no basis for the Superior Court to discuss Randy's statement when it evaluated the ineffective assistance of counsel allegations at Claim IV. Moreover, during her PCRA hearing testimony, Attorney Harper testified that she would have made the strategic decision not to call Randy as a defense witness to describe Larry's demeanor or note that Petitioner and Michelle had a five-minute argument because Randy would have been open to cross-examination of his whole statement, which contained Petitioner's statement to him that would come to the house and kill all of them. (PCRA Hr'g Tr., 1/30/13, at 148, 156.)

Because Petitioner has not overcome AEDPA's standard of review at § 2254(d), he is not entitled to habeas relief on this claim. That said, the Court would still deny this claim under a de novo review given the strength of the evidence that supported a first-degree murder conviction and the fact that there was a sufficient cooling off period between the series of events that Petitioner relies on to show provocation here (the statements Michelle allegedly made to him in a phone call the day before her murder (as recounted by Kimberly VanDivner in her statement) and Larry and Michelle's alleged taunting of Petitioner). Petitioner has not shown that if Trial Counsel had done all the things he asserts they should have done in Claim IV that there is a reasonable probability that the outcome of his trial would have been different.

For all these reasons, Claim IV is denied.

### D. *Brady* Claim

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Id.* at 87. The precepts of *Brady* are based on the most basic of constitutional guarantees to a person accused of a crime:  a right to due process of law and a fair trial. In our system of criminal justice, the government is not entitled to send a person to prison while it conceals from him favorable evidence that would tend to reasonably call into question his guilt. Impeachment evidence falls within the category of evidence that must be disclosed because "'[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *see also United States v. Bagley*, 473 U.S. 667 (1985).

Not every failure to disclose warrants relief under *Brady*. Rather, to prevail on his *Brady* claim, Petitioner has the burden of demonstrating: 1) favorable evidence was suppressed by the prosecution; and 2) the suppressed evidence was material. *See, e.g.*, *Slutzker v. Johnson*, 393 F.3d 373, 386 (3d Cir. 2004); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

In support of his *Brady* claim, Petitioner claims the prosecution suppressed the following three pieces of evidence:

1. The statement Randy Price gave to Trooper Monkelis, dated June 21, 2006. In this statement, Randy reported, in relevant part:[22]

> I was at Michelle Cable's house to use the phone & eat at a gathering she was having. She invited me to her house faithfully every time she cooked a big meal. Every holiday and so on. She was so happy that I showed up. She run up & give me a big hug & kiss. I was one of the few that wasn't drinking. So I was having fun fooling with everyone mainly Larry Newman. The people there at the time were Larry, Michelle, Kenny Newman, Billy Cable, Kenny's girlfriend and a few others that came and went. When Larry drinks he don't usually work the next day so I was trying to get him to eat so he would go to work the next day 'cause once he ate he wouldn't drink anymore. I made a phone call on Michelle's [phone] & left a message for my friend to call me back. [Approximately] 1 ½ to 2 hrs. later the phone rang & I answered it & a guy on the end said "who the fuck is this" and I said "who the fuck is this." Then the man said "you better tell me who the fuck this is." I stated "well you tell me who this is." I pretty much knew who the man was. Then he said I'm going to come down there and kill all of youns. I said o.k. we will be here. Michelle came over & said who is that & I said I think it's [Petitioner] & she took the phone & then started arguing with him for about 5 minutes & hung up. She came over & handed me the phone. I said who was that & she said [Petitioner]. I really didn't believe he was going to do anything. I told everyone there what he said & was joking about it. I told Larry you better leave [Larry] cause he's shooting you first you're the one staying here with his old lady. Larry said he ain't going to do nothing. Michelle chimed in I ain't no one's old lady. I can let anyone stay at my house that I want to. I don't care what [Petitioner] says. This is my house…. I asked Michelle why do you put up with this shit[?] She replied you know why. And I did. [Randy then recounts prior incidents in which Michelle had bruised eyes, arms and lips and told Randy that

---

[22] The minor spelling errors Randy made in his written statement have been corrected for clarity.

Petitioner had beat her.].... Back to the day Michelle got killed. I had Larry so mad enough he stopped drinking so I accomplished my mission with him. After a good while I knew my friend wasn't going to call me back [and] I walked home. I got in the bathtub & heard the fire whistle go off. Then I heard some other sirens & then a helicopter land[ed] on the ball field [indicating the shootings had occurred].

(Pet's PCRA Hr'g Ex. 23.)

2. That after the shootings Larry was so intoxicated that the police could not complete their interview of him. This information came out during Trooper Monkelis' PCRA hearing testimony. He described Larry as being "highly, highly intoxicated, to the point where [he] could not speak English that well on that occasion." (PCRA Hr'g Tr., 1/30/13 at 192-93.)

3. That Chrissie Newman, who said she was interviewed by the state police within hours of the shootings, told the officers what she saw during that shootings, which presumably would have included that she believed Petitioner was about 10 feet from Michelle when he shot her and that she did not observe Jessica Cable at the scene when the shooting occurred. (PCRA Hr'g Tr., 10/24/12 (afternoon), at 38-41.)

The Commonwealth does not contest Petitioner's assertion that this evidence was not disclosed to the defense before Petitioner's trial.

The Superior Court denied this *Brady* claim because it determined that neither Trooper Monkelis' observation about Larry Newman's level of intoxication nor Chrissie Newman's statements to the police after the shootings were memorialized in writing. Thus, it concluded, no *Brady* violation occurred with respect to that evidence. *VanDivner IV*, 2018 WL 6839326, at *13. Because of this conclusion, the Superior Court considered only whether the suppression of Randy Price's statement was material. *Id.* at *12-13. The Superior Court concluded that it was not because Attorney Harper testified at the PCRA hearing that she would not have called Randy Price at trial or used his statement because the other information contained in his statement (specifically, that Petitioner told Randy that he would come over to Michelle's house and kill them all) might then be introduced. (PCRA Hr'g Tr., 1/30/13, at 156.)

Petitioner argues that AEDPA's standard of review under § 2254(d) does not bar relief on this *Brady* claim because, among other reasons, neither Trooper Monkelis' observations about Larry Newman's inebriated condition nor Chrissie Newman's statements to police had to be memorialized in writing for them to qualify as *Brady* material. He also faults the Superior Court for considering Attorney Harper's PCRA testimony that she would not have changed her trial strategy if Randy Price's police statement had been disclosed to the defense. The proper inquiry, Petitioner points out, is what *competent* counsel would have done with the suppressed information and not what Petitioner's actual attorney said she would have done with that information.

This Court will assume that, as Petitioner argues, AEDPA's standard of review does not bar relief on this claim. The Court will also assume that Trooper Monkelis' observations about Larry Newman's inebriated condition as well as the information Petitioner contends Chrissie Newman stated to the police after the shootings are *Brady* material. The Court will do so because even under a de novo review Petitioner has failed to prove the suppressed information was material.

Materiality under *Brady* requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citation omitted). "A 'reasonable probability' of a different result is… shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* at 434 (quoting *Bagley*, 473 U.S. at 678). In other words, evidence is material when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. The materiality assessment requires that all suppressed evidence be "considered collectively, not item by item." *Id.* at 436.

Petitioner contends that competent counsel would have used Randy Price's statement and Trooper Monkelis' account of Larry's inebriated state to show that Larry was very drunk, aggressive, and primed to antagonize Petitioner when Petitioner arrived at Michelle's house. This information could also have been used to impeach Larry's trial testimony, Petitioner contends, since it would have called into question Larry's ability to recall the circumstances of the shootings and been used to show that he was not truthful when he testified that he only had "a couple" drinks at the gathering at Michelle's house. (Trial Tr. at 85.) Petitioner further argues that if the Commonwealth had not suppressed what Chrissie Newman told the police soon after the shootings, competent counsel would have developed evidence from her and from the other neighbors discussed in Claim I that then could have been used to cast doubt on the veracity of Jessica Cable's version of events. Used collectively, Petitioner contends, all of this favorable suppressed evidence "would have supported a voluntary manslaughter conviction." (Doc. 5 at 43.)

The Court is not persuaded by any of Petitioner's materiality arguments. The suppressed evidence does not cure the fact that there is an absence of evidence that *Michelle* provoked Petitioner at the scene of the crime or during the five-minute argument she had with him as described by Randy Price.[23] Similarly, there is still an absence of evidence that Petitioner lacked

---

[23] There is no evidence that Michelle subjected Petitioner to serious provocation during the five-minute argument Randy Price said she had with Petitioner when Petitioner called her house that day. Petitioner, who did not testify at the PCRA hearing, does not direct the Court to any evidence about what Michelle stated to him during their argument. Nor has Petitioner demonstrated around what time his five-minute phone argument with Michelle occurred, other than it happened at some point when Randy Price was at Michelle's house on July 5, 2004. Randy did not explain in his statement when he arrived at Michelle's house, or what time Petitioner called the house. He said he came to "use the phone & eat," but he did not state that he went there for dinner, which is what Petitioner claims. (Pet's PCRA Hr'g Ex. 23 at 1.) In any event, if Randy went to Michelle's house around dinner time, his statement reflects that he stayed at Michelle's for some time after he *Footnote continued on next page…*

a sufficient cooling off time between the alleged series of provocations he incurred by Michelle (either alone or with Larry). 18 Pa.C.S. § 2503(a) ("[a] person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by: (1) *the individual killed*; or (2) another whom the actor endeavors to kill, but he negligently or accidentally cause the death of the individual killed.") (emphasis added). Moreover, Petitioner's contention that competent counsel "would have adeptly woven any perceived drawbacks in Randy Price's statement into a defense strategy arguing for a voluntary manslaughter conviction[,]" (Doc. 20 at 25) is not convincing. The Court concludes competent counsel would not have utilized Randy Price under the circumstances.

Petitioner also overstates the importance of Larry Newman's trial testimony as it pertains to his first-degree murder conviction. Larry did not witness Petitioner shoot Michelle. At the trial, he testified about what happened when Petitioner arrived a Michelle's house and the skirmish with Petitioner on the sun porch before the shootings. (Trial Tr. at 77-82, 84-94.) Much of this same information was also covered during Billy Cable's and Kenny Newman's trial testimonies.

For all these reasons, Petitioner has not shown that, considered cumulatively, the suppressed evidence "undermines confidence in the verdict" rendered in his case for his shooting and killing of Michelle. *Kyles*, 514 U.S. at 433 (*Brady* requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *id.* at 434 ("A 'reasonable probability' of a different result is…shown when the

---

observed Michelle and Petitioner arguing on the phone, and that he also had time to walk home and get into the bath before the shootings occurred.

government's evidentiary suppression' undermines confidence in the outcome of the trial.'") (quoting *Bagley*, 473 U.S. at 678).

Accordingly, Claim II is denied.

### E.    Cumulative Prejudice

Finally, Petitioner contends in Claim V that if none of his ineffective assistance of counsel claims (Claims I, III and IV) or his *Brady* claim (Claim II) individually are sufficiently prejudicial to require relief, the cumulative prejudice incurred requires that he be granted relief. "The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." *Collins v. Sec'y of Pa. Dep't of Corr.*, 742 F.3d 528, 542 (3d Cir. 2014).

The Superior Court denied this claim on the merits. *VanDivner IV*, 2018 WL 6839326, at *13-14. This Court will review it de novo, however, because the Superior Court did not consider Trooper Monkelis' observation about Larry Newman's level of intoxication nor Chrissie Newman's statements to the police after the shootings to be *Brady* material and, therefore, did not consider the suppression of that information when it conducted its cumulative prejudice analysis.

The Court of Appeals has said that:

> Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

*Fahy v. Horn*, 516 F.3d 169, 204 (3d Cir. 2008).

The Court has concluded that neither Petitioner's individual *Strickland* claims nor his *Brady* claim resulted in any prejudice, and they no more do so when considered together. Petitioner has not met his burden of showing that Trial Counsels' alleged errors at issue in Claims I, III and IV and the nondisclosure of the evidence discussed in Claim II "had a substantial and injurious effect or influence" on the jury's verdict that he was guilty of first-degree murder when he shot and killed Michelle. The Court reaches this conclusion after considering the effect of the series of events at issue in all of his claims.

Therefore, Claim V is denied.

## III. Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from…the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]" 28 U.S.C. § 2253(c)(1)(A). It also provides that "[a] certificate of appealability may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2).

When the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Applying that standard here, jurists of reason would not find it debatable whether any of Petitioner's claims should be denied for the reasons given here. Accordingly, the Court will not issue a certificate of appealability.

**IV.    Conclusion**

Based on the above, the Court will deny the Petition (Doc. 5) and deny a certificate of appealability as to each claim.

An appropriate order follows.

BY THE COURT:

Dated: February 25, 2025

/s/ *Stephanie L. Haines*
Stephanie L. Haines
United States District Court Judge
Western District of Pennsylvania